# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| S.F., a minor, by her parents and next friends,<br><br>and<br><br>S.F. and J.F.<br><br>        Plaintiffs,<br><br>        v.<br><br>JACK R. SMITH (officially as),  Superintendent,<br>Montgomery County Public Schools,<br>850 Hungerford Drive,<br>Rockville, Maryland 20850,<br><br>and<br><br>MONTGOMERY COUNTY BOARD OF<br>EDUCATION,<br>850 Hungerford Drive,<br>Rockville, Maryland 20850,<br><br>        Defendants. | Civil Action No. _____ |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

### Preliminary Statement

1.      This is an action brought by J.F. and S.F. ("the parents"), in their own right and on behalf of their daughter, S.F., alleging that Montgomery County Public Schools ("MCPS"), failed to provide S.F. with the Free Appropriate Public Education ("FAPE"), to which she is entitled under the Individuals With Disabilities Education Improvement Act ("IDEA"), 20 U.S.C. §§ 1400 *et seq.*  In addition, the Administrative Law Judge ("ALJ"), in this action compounded the violation by committing numerous additional violations of the IDEA and its Due Process of

law protections.  Accordingly, the ALJ denied the parents their requested relief of funding and

placement at the Lab School of Washington ("Lab School"), located in Washington, D.C.  The

Court should reverse the ALJ's Decision and award the parents their long-overdue relief.

## Jurisdiction

2.     This Court has jurisdiction pursuant to the Individuals with Disabilities Education

Improvement Act ("IDEA"), 20 U.S.C. §§ 1400 *et seq*.; the Rehabilitation Act of 1973 ("Section

504"), 29 U.S.C. § 794; 42 U.S.C. § 1983 ("Section 1983"); and 28 U.S.C. §§ 1331 and 1343.

Declaratory relief is authorized by 28 U.S.C. §§ 2201 and 2202.  This Court has pendent

jurisdiction pursuant to MD. CODE ANN. EDUC. § 8-413.  Plaintiffs have exhausted their

administrative remedies and appeal from a decision of an Administrative Law Judge of the

Maryland Office of Administrative Hearings, MSDE-MONT-OT-18-34695 (April 1, 2019).

## Parties

3.     S.F. is a ten-year-old educationally disabled student, eligible to receive

accommodations and special education services under the IDEA. At all times relevant to this

action, she resided in Montgomery County, Maryland.  Her parents, J.F. and S.F. bring this action

on S.F.'s behalf and in their own right.

4.     Jack R. Smith is the Superintendent of the Montgomery County Public Schools

("MCPS" or "the school system"), and as such, is the public official charged with the

responsibility for ensuring that MCPS complies with federal law as to the education of disabled

children. He is sued in his official capacity.

5.     The Montgomery County Board of Education receives financial assistance from

the United States Department of Education. The Montgomery County Board of Education is responsible for complying with federal law with respect to the provision of a FAPE to each disabled child in Montgomery County under the IDEA.

## Factual Allegations

6.      S.F. is a ten-year-old student residing in Chevy Chase, Maryland, who has been found eligible for special education services as a student with a Specific Learning Disability by Montgomery County Public Schools ("MCPS").

7.      S.F. struggled early on with the acquisition of academic skills, especially in all areas of language arts.  By preschool, her parents noticed she was not learning as well as expected.

8.      In August 2014, S.F. began Kindergarten at Little Bennett Elementary School ("Little Bennett"), in Montgomery County.

9.      Soon after school started, S.F. began receiving extra support with a paraeducator because she was not acquiring sight words.

10.      Little Bennett staff began providing S.F. an hour per week of a Leveled Literacy Intervention ("LLI"), an informal reading intervention.

11.      S.F. finished Kindergarten below grade level in reading, at level three.

12.      After Kindergarten, S.F. attended summer school at Little Bennett and her parents also provided one hour per week of tutoring.

13.      In first grade, reading and writing continued to be areas of significant weakness for S.F.  Her parents met with her teacher and some informal additional support was provided.

14.     Concerned with her slow progress in reading and writing, and her particular difficulty with retaining information, S.F.'s first grade teacher made a referral for special education screening.

15.     S.F.'s parents sought advice from S.F.'s pediatrician, who also suspected a learning disability and recommended psycho-educational testing and an Individualized Education Program ("IEP"), as soon as possible.

16.     Despite parental and teacher concerns, Little Bennett did not refer S.F. for further testing for an educational disability in first grade.

17.     In February 2016, Little Bennett staff replaced the LLI reading intervention with a different program, Early Intervention in Reading ("ERI"), with a paraeducator.

18.     S.F. finished first grade below grade level in reading, at level thirteen.

14.     During the summer between first and second grade, S.F. again received tutoring in addition to attending summer school at Little Bennett.

15.     At the start of second grade, S.F.'s reading ability had regressed several levels since the end of first grade and was reported to be at level nine.

16.     At the insistence of her parents, Little Bennett staff began more intensive interventions in second grade.  S.F. received visual phonics with one other student for forty minutes per week and continued her ERI sessions with a paraeducator four times per week.

17.     By mid-second grade, S.F. had made minimal progress in reading and had only improved to level ten.

18.     S.F.'s second grade teacher made another referral for special education screening due to S.F.'s continued difficulties in reading and writing.

19.     S.F.'s teacher reported that she had a very hard time recalling "word wall" words or math facts.  S.F. also had a difficult time reading back some of her writing and would often give up on a task without attempting it.  Her teacher also noted that S.F. was putting enormous pressure on herself, which contributed to her inability to perform, as she did not want to be seen as a failure by others.

20.     On January 24, 2017 at an IEP screening meeting, MCPS obtained consent from S.F.'s parents to evaluate her for special education services.

21.     An Educational Assessment Report was completed by Stacy Mallow of MCPS on March 3, 2017.

22.     Ms. Mallow found that S.F. had a relative strength in math and strong comprehension skills.  However, her deficits included reading decoding, specifically the use of short vowels, recall of sight words, and difficulty re-reading what she had written.  Other areas of need included encoding and writing conventions.

23.     Ms. Mallow noted that S.F. was, "very aware of her peers and concerned when she feels she is appearing different."  She made some recommendations for supports and instructional strategies including direct, consistent instruction with opportunities for practice and repetition of new skills, and a multisensory approach to teaching.

24.     On March 8, 2017, an MCPS psychologist, Jodi M. Ward, administered cognitive and social-emotional testing to determine S.F.'s present levels of functioning.

25.     On the Wechsler Intelligence Scales for Children, Fifth Edition ("WISC-V"), S.F. achieved a Full Scale IQ of 91 (Average), with skills ranging from Low Average to Average.

26.     Ms. Ward reported that S.F.'s score on the Jordan Left-Right Reversal Test, a test administered to assess a student's difficulty with letter and number reversals, was in the deficient range.

27.     An IEP meeting was held on April 5, 2017 to discuss the results of the evaluations and complete the screening process.

28.     MCPS found S.F. eligible for special education services as a student with a Specific Learning Disability in the areas of reading (decoding and fluency), and written expression.

28.     The IEP team developed an IEP for S.F. with one goal in reading and one goal in written expression, and provided two hours per week of specialized reading instruction outside of the general education classroom and five hours of support in the classroom.

29.     The IEP provided slightly more services to S.F. than she had been receiving through her interventions for the past two-and-a-half years.

30.     S.F. began third grade, the 2017-18 school year, at Little Bennett.

31.     Shortly after she started school, MCPS reported that S.F. was reading at a level 6 or 7.  Not only was this far below grade level, but it represented significant regression from where she was reading the previous school year.

32.     In September and October 2017, S.F. underwent a psychoeducational evaluation by Dr. Anthony Henley to get an updated assessment of her functioning, and for her parents to obtain guidance as to appropriate educational interventions.

33.    Dr. Henley administered academic achievement testing which revealed multiple areas of severe deficit, including writing the alphabet, sight word reading, phonetic decoding, fluency, and comprehension.

34.    Dr. Henley found S.F.'s writing to be very deficient, and her spelling was extremely weak.

35.    Dr. Henley administered tests of phonological processing to S.F., which revealed significant deficits with phonological awareness, phonological memory, and rapid naming.

36.    Dr. Henley warned that there were emerging difficulties with S.F.'s self esteem as a result of her severe academic deficits.

37.    Dr. Henley diagnosed S.F. with a specific language-based learning disability (dyslexia), which has a significant impact on her acquisition of skills in reading and writing in particular, but math as well.

38.    Dr. Henley noted that there were several signs throughout the evaluation that S.F.'s cognitive potential was strong; however her academic performance was weak and far below the average range in a number of areas.

39.    Dr. Henley recommended that S.F. receive an Orton-Gillingham reading intervention.  He also provided a comprehensive list of instructional strategies and classroom accommodations to alleviate the frustrations and difficulties S.F. encounters as a result of her learning disability.

40.    In September and October 2017, S.F.'s mother exchanged several emails with the principal and staff at Little Bennett expressing her concern for her daughter's lack of progress.

41.     S.F.'s mother shared the results of Dr. Henley's evaluation, and requested specific interventions be discussed and added to the IEP at the next meeting, including a multisensory Orton-Gillingham evidence-based, one-on-one intervention.

42.     On November 9, 2017, an IEP progress report stated that S.F. was not making sufficient progress to meet her reading phonics goal.

43.     On November 16, 2017, an IEP meeting was held to review Dr. Henley's evaluation and update S.F.'s IEP accordingly.

44.     The MCPS team concluded that Dr. Henley's evaluation was consistent with the assessments completed by MCPS in March 2017.

45.     The MCPS IEP team reconfirmed S.F.'s eligibility as a student with a Specific Learning Disability and added a new diagnosis of dyslexia.

46.     Due to S.F.'s failure to meet benchmarks in reading and writing and declining self-esteem, the team added goals in the areas of reading phonics, reading fluency, math calculation, written language expression, and social-emotional/behavioral, but were unable to finish developing the goals due to time restraints.  Instead, the team focused on the supplemental aids and services, and agreed to meet at later date to finish developing the IEP and discuss service hours.

47.     The team did not agree to provide S.F. with an Orton-Gillingham reading intervention, but instead determined it would continue with the same reading interventions it had been using, despite their lack of success.

48.     Based on Dr. Henley's recommendation, the family began working with an educational consultant and academic therapist, Lisa Taylor, at Imagine Possibility, LLC.

49.     Ms. Taylor, a special education expert certified in Orton-Gillingham, reviewed the November 16, 2017 IEP and made several proposed amendments to the goals and accommodations.

50.     Ms. Taylor also recommended that MCPS use Orton-Gillingham or Wilson as S.F.'s reading intervention five days per week.

51.     S.F. began working with an Orton-Gillingham trained academic therapist through Imagine Possibility.  She received individual reading therapy using Orton-Gillingham, three times per week for one hour per session.

52.     S.F. started private tutoring in November 2017.  The tutoring continued through the summer of 2018.

53.     On December 21, 2017, an incident at school sparked new concern for S.F.'s participation in the general education classroom.  She reported being humiliated after being called upon to read in front of her class, and to write a math problem on a Promethean board.

54.     On January 22, 2018, an MCPS Elementary Teacher Report stated that S.F. was reading at level eleven with 90% accuracy and continued to have difficulty on her reading goal addressing blends, digraphs, and vowel patterns.  This was the same reading goal she had not been making progress towards on November 9, 2017.

55.     On February 20, 2018, the IEP team met to continue developing S.F.'s IEP from November 2017.

56.     In the February 20th meeting, many of Ms. Taylor's recommendations were incorporated into the draft IEP document.

-9-

57.     However, at the February 20th meeting, MCPS refused to include either Wilson or Orton-Gillingham reading interventions in the IEP or as part of S.F.'s program.

58.     In the February 20th meeting, MCPS determined that it would continue with the same failed reading interventions it was already providing.

59.     In the February 20th meeting, the parents requested a speech/language evaluation to rule in/out a receptive or expressive language disorder.  The parents provided their consent for MCPS to complete this assessment at the meeting.

60.     Left with no other option and the stark reality that MCPS was not educating their daughter over the years, the parents began looking into non-public special education schools for S.F. for the 2018-19 school year.

61.     The parents applied to the Lab School of Washington ("Lab"), and S.F. was accepted on March 2, 2018 for the following school year.

62.     Lab School is a small nonpublic school located in Washington D.C. that specializes in meeting the needs of students with language-based learning disabilities like S.F.

63.     In March 2018, the speech/language assessment was completed by Tonya Frazier, an MCPS speech/language pathologist.  Ms. Frazier administered standardized tests which resulted in mostly average scores.

64.     Based on her observation of S.F. and the test results, Ms. Frazier concluded that the data did not support the presence of oral communication needs.

65.     On April 16, 2018, the IEP team met again to finish S.F.'s IEP.  The parents attended with Ms. Taylor and counsel.  The team discussed S.F.'s progress, specifically her improvement in reading phonics and writing skills.

-10-

66.     In the April 16th meeting, Her parents attributed her success and reading progress to her Orton-Gillingham private tutoring.

67.     The team reviewed Ms. Frazier's report and determined that S.F. did not require speech/language services.  However, Ms. Taylor and her parents disagreed and requested that she receive speech/language services to address comprehension.  The MCPS team refused to add any speech/language service hours.

68.     In the April 16th meeting and, upon request from the parents and Ms. Taylor, MCPS added dyscalculia and dysgraphia to S.F.'s diagnoses and accepted their request for thirty minutes of counseling per week.

69.     In the April 16th meeting, MCPS proposed approximately seventeen hours of specialized instruction in the general education classroom and just four hours of pull-out support, despite the parents' request for more intensive services.

70.     S.F.'s parents disagreed with the addition of more service in the general education classroom and reiterated S.F.'s need for an increase in pull-out service.  The IEP team refused to make any changes to the proposed hours.

71.     In the April 16th meeting, MCPS continued to propose placement at Little Bennett, despite several years of little-to-no progress there.  S.F.'s parents again stated their disagreement with the service hours and the inappropriateness of the proposed IEP and placement.

72.     At the end of the IEP meeting, S.F.'s parents served notice of their intent to place S.F. at Lab for the 2018-19 school year and to seek funding for that placement.

73.     According to the school system's data, S.F. ended the 2017-18 school year at a level K, which put her in the middle of second grade.  This was still well below grade level and inconsistent with the data from her Orton-Gillingham therapist and Ms. Taylor.

74.     S.F. was increasingly aware of her learning differences and her inability to read like her peers.  As a result, she exhibited increased anxiety and frustration throughout her last year at Little Bennett.  When these instances occurred, she would be unavailable for learning. She often cried, both at home and in school, and expressed her frustration and sadness to her parents and her academic therapist.

75.     Over the summer of 2018, S.F. attended the Lab School summer program.  She received instruction through Orton-Gillingham for reading and also Occupational Therapy services.

76.     S.F. resumed her work with through private tutoring after the Lab program was completed in the summer of 2018.

77.     S.F. started the 2018-19 school year at Lab School and immediately responded positively to the school environment.  She became happy to attend school each day and her parents noticed a change in her overall attitude toward learning.

78.     At Lab School, S.F. receives 1:1 daily reading instruction through Orton-Gillingham and specialized instruction in all areas throughout the school day.

79.     In September 2018, the parties agreed to return to the IEP table to review data submitted by Lisa Taylor related to S.F.'s progress using the Orton-Gillingham method the prior school year.

-12-

80.     The team met in September of 2018, reviewed the data, received a brief update

from the parents, and agreed to amend the IEP.  Specifically, the team agreed to increase S.F.'s

time outside of the general education setting by an hour, or to five-and-a-half hours per week of

specialized instruction, in order to ensure a daily reading intervention.

81.     At the September 2018 meeting, there were three supplementary aids added to the

IEP and a minor change to one goal.

82.     In September of 2018, while not reflected on the IEP, MCPS informed the parents

for the first time that Little Bennett could offer the Orton-Gillingham intervention to S.F., on a

daily basis, delivered by an Orton-Gillingham trained reading specialist.

83.     Despite this new offer in September of 2018, the parents continued to object to the

MCPS proposal due to its insufficient amount of specialized instruction.  Moreover, S.F. was at

the Lab School and doing well by the time MCPS made its new proposal.

84.     Due to ongoing parental concerns with S.F.'s fine motor and handwriting, an

Occupational Therapy assessment was completed in September 2018 by Lab School.  It took four

days for S.F. to complete the testing due to hand fatigue and increased frustration with visual

testing.

85.     S.F.'s visual perceptual skills were found to be an area of weakness when she was

presented with simple images or large letters and numbers.  She also demonstrated needs in fine

motor, especially dexterity, finger strength, and stability when drawing.

86.     S.F. also had difficulty with visual/motor skills when copying familiar shapes, and

catching and throwing a ball.

87.     S.F.'s handwriting revealed inadequate skills with letter alignment, inconsistent letter sizing and capitalizing letters within lowercase words.  She also showed signs of potential ocular motor deficits.  S.F. had inadequate bilateral coordination skills, upper body strength, and motor planning.

88.     The Occupational Therapy evaluation revealed a complex sensory profile which impacts S.F. throughout the day and interferes with her availability for learning.

89.     The Occupational Therapy evaluator made many recommendations including direct school-based Occupational Therapy services twice a week for 45 minutes per session.  She also recommended integrated therapy.  S.F.'s parents gave consent for services to begin immediately following the assessment.

90.     Lab School also identified Speech and Language as a potential area of need for S.F., especially as it relates to her phonological awareness.

91.     Based on its informal assessment, Lab began providing Speech and Language services to S.F. in November 2018 for forty-five minutes per week.

92.     S.F.'s parents returned to another IEP meeting with MCPS on December 19, 2018 to consider additional documentation from Lab School including an MCPS review of the Lab School OT report.

93.     In December 2018, the team found that S.F. did not qualify for Occupational Therapy services.  The parents disagreed.

94.     In December 2018, the team made minor changes to the IEP, but the overall proposal remained the same.

95.     The parents filed a due process appeal based on the inappropriate MCPS proposal for S.F. for the 2018-19 school year.

96.     A due process hearing was held over the course of ten days in January through March 2019.

97.     S.F.'s parents presented evidence and testimony from Lisa Taylor, an expert in special education with an emphasis in Orton-Gillingham and the family's educational consultant; Anthony Henley, an expert in clinical psychology with an emphasis on the remediation of dyslexia through the Orton-Gillingham method; Donna Pavluk, Speech and Language Pathologist at the Lab school and expert in speech and language therapy; Judy Shincarick, Associate Head of the Elementary Division at Lab School and expert in Occupational Therapy; Karen Duncan, Education Director at the Lab School; and S.F.'s mother.

98.     The school system presented testimony from:  Angela Mayers, MCPS special education teacher and expert in general and special education; Christa Horn, MCPS reading specialist and expert in special education and reading instruction; Jennifer Ahn, MCPS teacher and expert in elementary education; Tonya Frazier, MCPS Speech and Language therapist and expert in speech and language; and Lynn Tozzi, MCPS Occupational Therapist and expert in Occupational Therapy.

99.     The parents subpoenaed two additional witnesses who testified at the hearing: Heather Gleason, an MCPS special education teacher, and Eric Kuhn, an MCPS special education administrator.

100.    The parents presented evidence that S.F. is a student with severe dyslexia.

101.    The parents' experts testified that the only reading program that can appropriately address and remediate S.F.'s severe dyslexia is Orton-Gillingham.

102.    The parents presented evidence that S.F. failed to make meaningful educational progress during her time in MCPS, and especially in reading during her third grade year at Little Bennett.

103.    The parents presented evidence that from first grade until the middle of third grade, S.F.'s reading level declined according to MCPS records.

104.    The parents presented evidence that S.F. struggled with anxiety during her time in MCPS.  Specifically, during third grade, the parents' evidence showed that S.F. had increased instances of crying, frustration, shut down, and overall anxiety associated with Little Bennett.

105.    The parents presented evidence that S.F. is a student in need of both Speech and Language and Occupational Therapy intervention and services in order to meet her unique needs.

106.    The parents presented evidence that S.F. responded well to the 1:1 reading tutoring provided by Imagine Possibility and through the use of the recommended Orton-Gillingham intervention, S.F. began to make progress in reading.

107.    The evidence at hearing revealed that the belated training of MCPS staff for the 2018-19 school year in Orton-Gillingham is not appropriate or sanctioned by the Academy of Orton-Gillingham.

108.    The parents presented evidence that S.F. is thriving at the Lab School, where she is making academic progress and showing significantly reduced signs of anxiety.

109.    On April 1, 2019, the ALJ issued her Decision in favor of MCPS, denying the parents all requested relief.

110. The ALJ incorrectly concluded that the evidence did not support a finding that S.F. requires Speech and Language and Occupational Therapy interventions to meet her needs.

111. The ALJ ignored the Lab School Occupational Therapy assessment based on her incorrect determination that it was more "clinical" in nature and therefore did not reflect S.F.'s needs in the classroom. This was contrary to clear evidence before her.

112. The ALJ erred in finding that the proposed IEP for the 2018-19 school year was substantially different from the 2017-18 school year such that it was reasonably calculated to lead to educational progress for S.F.

113. The ALJ incorrectly concluded that S.F. made meaningful progress during third grade, the 2017-18 school year.

114. The ALJ acknowledged that S.F. received "enormous benefit" from the private tutoring provided by Imagine Possibility, then proceeded to ignore her own conclusion.

115. The ALJ erred in failing to recognize that the primary reason S.F. made progress toward the end of the year in third grade was due to her private tutoring.

116. The ALJ ignored the enormous impact of S.F.'s anxiety and social/emotional difficulties during third grade, and their effect on her overall functioning.

117. The ALJ erred in concluding that S.F.'s social/emotional difficulties could be appropriately addressed by the addition of one counseling session per week.

118. The ALJ erred in concluding that MCPS and Little Bennett could appropriately implement S.F.'s IEP despite their inability to provide staff with appropriate training on the implementation of the Orton-Gillingham intervention.

119.    The ALJ ignored evidence that MCPS would continue to provide S.F. with reading interventions that had proved unsuccessful in teaching her to read.

120.    The ALJ erred in giving less deference to the parents' witnesses in favor of school system witnesses.

121.    Throughout the hearing, the ALJ demonstrated a lack of judicial behavior and professional judgment.  She openly discussed with hearing participants her own child's special needs and how she was being instructed in how to deal with her own situation by what she was learning at the hearing.

122.    The ALJ also excluded, without reason, significant evidence that MCPS had recognized its inability to teach children such as S.F. how to read.

123.    The ALJ's Decision contain multiple errors of fact and law.

124.    The ALJ's findings of fact are not regularly made.

125.    The ALJ applied incorrect legal standards in reaching her Decision.

126.    The parents are aggrieved by the ALJ's Decision.

127.    The plaintiffs have exhausted their administrative remedies.


**COUNT I**

128.    Plaintiffs incorporate as though restated each of the factual allegations stated in paragraphs 1 through 74.

129.    Defendants' failure to provide S.F. with a free appropriate public education violates plaintiffs' rights under the IDEA and Maryland law.

**COUNT II**

130.    Plaintiffs incorporate as though restated each of the factual allegations stated in paragraphs 1 through 74.

131.    Defendants' failure to provide S.F. with an appropriate educational placement violates plaintiffs' rights under the IDEA and Maryland law.

**COUNT III**

132.    Plaintiffs incorporate as though restated each of the factual allegations stated in paragraphs 1 through 74.

133.    The ALJ committed error, and violated plaintiffs' due process rights under the IDEA and Maryland law, by failing to conduct a fair, competent and impartial due process hearing, failing to render a proper decision based on an accurate and impartial understanding of the facts and law.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiffs respectfully request that this Court:

1.    Issue judgment for plaintiffs and against defendants;

2.    Issue declaratory relief that defendants violated plaintiffs' rights under applicable law;

3.    Issue injunctive relief, vacating the decision of the ALJ and ordering defendants to reimburse plaintiffs for the costs associated with enrolling S.F. at the Lab School of Washington for the 2018-19 school year;

4.    Order defendants to place and fund S.F. at the Lab School and declare it to be her current educational placement under the IDEA;

5.    Order defendants to pay plaintiffs' reasonable attorneys' fees and costs, including the fees and costs of this action; and

6.     Award any other relief that this Court deems just.

Respectfully Submitted,

_____/s/_____
Michael J. Eig          #07718
Paula A. Rosenstock     #09798
MICHAEL J. EIG AND ASSOCIATES, P.C.
5454 Wisconsin Avenue
Suite 760
Chevy Chase, Maryland 20815
(301) 657-1740

Counsel for Plaintiffs