## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### *Southern Division*

| | | |
|---|---|---|
| S.F., *et al.*, | * | |
| Plaintiffs, | * | |
| v. | * | **Case No.: 19-2207-PWG** |
| JACK R. SMITH, *et al.*, | * | |
| Defendants. | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

### MEMORANDUM OPINION AND ORDER

S.F., a minor, by and through her parents, J.F. and S.F., who also joined their daughter as Plaintiffs, filed suit against Jack R. Smith in his official capacity as Superintendent of Montgomery County Public Schools ("MCPS") and Montgomery County Board of Education ("the Board"). Compl., ECF No. 1. Plaintiffs claim that Defendants failed to provide S.F., a ten-year-old educationally disabled student, with the Free Appropriate Public Education ("FAPE") to which she is entitled under the Individuals with Disabilities Education Improvement Act ("IDEA"), 20 U.S.C. §§ 1400 *et seq. Id.* at ¶¶ 1, 3. They ask the Court to reverse the decision of the administrative law judge ("ALJ") and award S.F.'s parents their requested relief of funding and placement at the Lab School of Washington ("Lab School"), located in Washington, D.C. *Id.* at ¶ 1.

According to Plaintiffs, the ALJ made multiple errors in her findings and in conducting the hearings, including the failure to consider the significance of the parents' interventions, without which, S.F. would not have made the alleged progress that the ALJ relied on in reaching her conclusions.

The parties have filed cross-motions for summary judgment.  ECF Nos. 18, 22.  I have reviewed all the filings, including the administrative record, and find a hearing unnecessary.  *See* Loc. R. 105.6 (D. Md. 2021).  For the reasons that follow, I affirm the ALJ's decision that Defendants provided S.F. with the FAPE to which she is entitled under IDEA, deny the Plaintiff's motion for summary judgment, and grant Defendants' cross-motion for summary judgment.

## BACKGROUND

### I.    Statutory Background

The Individuals with Disabilities Education Act ("IDEA") is intended "to ensure that all children with disabilities have available to them a free appropriate public education ["FAPE"] that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A); § 1412(a)(1)(A). Maryland regulations "govern[ ] the provision of FAPEs to children with disabilities in accordance with the IDEA." *M.C. v. Starr*, No. DKC-13-3617, 2014 WL 7404576, at *1 (D. Md. Dec. 29, 2014) (citing Md. Code Regs. Tit. 13A, § 05.01). A FAPE is an education that provides "meaningful access to the educational process" in "the least restrictive environment" and is "reasonably calculated to confer 'some educational benefit'" on the child with a disability. *Id.* (citing *Bd. of Educ. of the Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 192, 207 (1982)). "The benefit conferred . . . must amount to more than trivial progress," but "[t]he IDEA does not require that a school district provide a disabled child with the best possible education . . . ." *Id.* (citing *Rowley*, 458 U.S. at 192; *Reusch v. Fountain*, 872 F. Supp. 1421, 1425 (D. Md. 1994)). Rather, a school must provide an Individualized Education Program ("IEP") that is "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, ⸺ U.S. ⸺, 137 S. Ct. 988, 999

(2017) (noting that "[a]ny review of an IEP must appreciate that the question is whether the IEP is *reasonable*, not whether the court regards it as ideal").

To this end, each child with a disability must have an IEP that "state[s] the student's current educational status, annual goals for the student's education, which special educational services and other aids will be provided to the child to meet those goals, and the extent to which the child will be 'mainstreamed,' i.e., spend time in regular school classroom with non-disabled students." *M.C.*, 2014 WL 7404576, at *1 (citing 20 U.S.C. § 1414(d)(1)(A)); *see Endrew F.*, 137 S. Ct. at 994.

> The IEP is "the centerpiece of the statute's education delivery system for disabled children." *Honig v. Doe*, 484 U.S. 305, 311 (1988). A comprehensive plan prepared by a child's "IEP Team" (which includes teachers, school officials, and the child's parents), an IEP must be drafted in compliance with a detailed set of procedures. [20 U.S.C.] § 1414(d)(1)(B) (internal quotation marks omitted). These procedures emphasize collaboration among parents and educators and require careful consideration of the child's individual circumstances. § 1414. The IEP is the means by which special education and related services are "tailored to the unique needs" of a particular child. *Rowley*, 458 U.S., at 181.

*Endrew F.*, 137 S. Ct. at 994.

If the IEP team members disagree about the contents of an IEP, they can try to "resolve their differences informally, through a '[p]reliminary meeting,' or, somewhat more formally, through mediation," and if they do not reach agreement, they can participate in "a 'due process hearing' before a state or local educational agency." *Id.* (quoting 20 U.S.C. §§ 1415(e), (f)(1)(A), (B)(i), (g)). Then, "the losing party may seek redress in state or federal court." *Id.* (citing 20 U.S.C. § 1415(i)(2)(A)).

In Maryland, parents may voice disagreement with their children's proposed IEPs and request due process hearings before the Maryland Office of Administrative Hearings to address their concerns. *See M.C.*, 2014 WL 7404576, at *2 (citing 20 U.S.C. § 1415(b)(6), (f); Md. Code

Ann., Educ. § 8–413; Md. Code Regs. Tit. 13A, § 05.01.15(C)(1)). "Any party can then appeal the administrative ruling in federal or state court." *Id.* (citing Educ. § 8–413(h)). Additionally, parents may place their children in a private school that is "appropriate to meet the child's needs" and "seek tuition reimbursement from the state," but only "if the court or hearing officer finds that the agency had not made a free appropriate public education available to the child in a timely manner prior to that enrollment." *Id.* (quoting Title 20 § 1412(a)(1)(C)(iii); citing *Sch. Comm. of Burlington v. Dep't of Educ.*, 471 U.S. 359, 369-70, (1985)) (emphasis from *M.C.* removed).

## II.    Factual and Procedural Background[1]

S.F. was born on July 13, 2009 and began kindergarten in August 2014 at Little Bennett Elementary School ("Little Bennett") in Montgomery County, Maryland.  Little Bennett is SF's home school based on her residence.  S.F.'s struggles with language skills became apparent early, and soon after school started, she began receiving one hour a week of Leveled Literacy Intervention ("LLI"), an informal reading intervention, with a paraeducator. S.F. finished kindergarten with an instructional reading level of 3, which was below grade level, and she attended a summer school program at Little Bennett in 2015 before starting first grade.

S.F. continued to struggle with reading and writing, and her first-grade teacher made a referral for special education screening.  S.F.'s pediatrician also recommended psycho-educational testing and an IEP as soon as possible. At that time, the IEP team determined that her progress was

---

[1]    Much of the background in this case is undisputed and is provided here for context, generally without citation. If a fact is disputed, it is noted with a citation to its source. In reviewing a motion for summary judgment, the Court considers the facts in the light most favorable to the nonmovant, drawing all justifiable inferences in that party's favor. *Ricci v. DeStefano*, 557 U.S. 557, 585–86 (2009); *George & Co., LLC v. Imagination Entm't Ltd.*, 575 F.3d 383, 391-92 (4th Cir. 2009). Where, as here, the Court is presented with cross-motions for summary judgment, the facts relevant to each motion must be considered in the light most favorable to the nonmovant. *Mellen v. Bunting*, 327 F.3d 355, 363 (4th Cir. 2003).

sufficient and found her ineligible for special education services. Little Bennett did not refer S.F. for further testing for an education disability.  In February 2016, Little Bennett staff replaced the LLI reading intervention with a different program, Early Intervention in Reading ("EIR"). S.F. finished first grade with an instruction reading level of 13, which was below grade level, and she again attended a summer school program at Little Bennett before starting second grade.

By the time S.F. started second grade, her reading ability had regressed to level 9, and by the middle of the year, she had improved only to level 10.  S.F.'s second grade teacher made another referral for special education screening.  In December 2016, the IEP team determined that S.F. should be screened for special education services. On January 24, 2017, MCPS sought consent from S.F.'s parents to evaluate her for special education services.  An Educational Assessment Report was completed by Stacy Mallow at MCPS on March 3, 2017.  She found that S.F. had deficits in reading decoding, specifically the use of short vowels, recall of sight words, difficulty re-reading what she had written, and in need of help with encoding and writing conventions. On March 8, 2017, Jodi Ward, an MCPS psychologist, administered cognitive and social-emotional testing to determine S.F.'s present levels of functioning and potential for learning. Ms. Ward reported that S.F. had an average full scale IQ, with skills ranging from Low Average to Average, and a score on the Jordan Left-Right Reversal Test that was in the deficient range. The IEP team met and determined that S.F. was eligible for special education services as a student with a Specific Learning Disability, and a program was developed with a goal in reading and a goal in written expression.  S.F. finished second grade with a reading level of 12, which was not only below grade, but also below her measured reading level at the end of the first grade. S.F. attended the summer school program at Little Bennett before starting third grade.

S.F. started third grade at Little Bennett at a reading level of 6 or 7, a significant regression from the previous year. That fall, S.F. underwent a psychoeducational evaluation by Dr. Anthony Henley.  Dr. Henley diagnosed S.F. with a specific language-based learning disability (dyslexia[2]).  Dr. Henley recommended that S.F. receive an Orton-Gillingham ("OG") reading intervention, which is a specific phonologically-based approach, and he provided a list of instructional strategies and classroom accommodations to alleviate S.F.'s frustrations as a result of the learning disability.  He also recommended that S.F.'s parents begin working with Lisa Taylor, M.Ed., owner and Director of Imagine Possibility, LLC. S.F.'s parents asked Little Bennett to implement Dr. Henley's recommendations.  His report was reviewed by the IEP team on November 16, 2017, at a meeting was held with Dr. Henley, S.F.'s parents, and Ms. Taylor, who had become their educational consultant.  Ms. Taylor also recommended that MCPS use OG, or a variation called Wilson, as S.F.'s reading intervention five days per week.  The IEP team did not agree to provide S.F. with an OG reading intervention and determined to use the same reading intervention, EIR, that it had been using in first grade.  As a result, S.F.'s parents arranged for S.F. to being working with an OG-trained academic therapist through Imagine Possibility, and she received individual reading therapy using OG for three one-hour sessions each week starting in November 2017 through the end of June 2018.

---

[2]      "Dyslexia is a specific learning disability that is neurobiological in origin. It is characterized by difficulties with accurate and/or fluent word recognition and by poor spelling and decoding abilities. These difficulties typically result from a deficit in the phonological component of language that is often unexpected in relation to other cognitive abilities and the provision of effective classroom instruction. Secondary consequences may include problems in reading comprehension and reduced reading experience that can impede growth of vocabulary and background knowledge."  Definition of Dyslexia, https://dyslexiaida.org/definition-of-dyslexia/ (last visited July 19, 2022).

In January 2018, S.F. was reported to be reading at level 11, which was two levels below where she had been at the end of the first grade.  On February 20, 2018, the IEP team met to further develop S.F.'s IEP, and many of Ms. Taylor's recommendations were incorporated into the draft IEP document. But MCPS refused to include either Wilson or OG reading interventions and decided to continue with IER.  S.F.'s parents began to search for a non-public special education school for the next school year, and applied to the Lab School, where S.F. was accepted for the fourth grade (2018-19 school year).  In March 2018, an MCPS speech/language pathologist, Tony Frazier, administered standardized tests, which produced mostly average scores, and she concluded that the data did not support the presence of oral communication needs.  Ms. Taylor and S.F.'s parents disagreed with the conclusion and requested that S.F. receive speech/language services.

On April 16, 2018, the IEP team met to finish S.F.'s IEP.  S.F.'s parents, Ms. Taylor, and counsel also attended the meeting.  MCPS added dyscalculia[3] and dysgraphia[4] to S.F.'s diagnoses and accepted the request for 30 minutes of counseling per week.  S.F.'s parents also asked for an increase in specialized instruction outside the general education classroom, but the IEP team determined that four hours per week was sufficient.  And the IEP team continued to propose placement at Little Bennett. S.F.'s parents voiced their disagreement with the IEP team's decisions and served notice of their intent to place S.F. at the Lab School for the 2018-19 school year as well as to seek funding for the placement.

---

[3]     Dyscalculia is a math learning disorder.  Definitions, https://www.dyscalculia.org/ (last visited July 19, 2022)

[4]     Dysgraphia is impaired handwriting, impaired spelling, or both. What is dysgraphia? https://dyslexiaida.org/understanding-dysgraphia/ (last visited July 19, 2022).

MCPS reported that S.F. was meeting all her IEP goals by the end of the third grade. S.F. ended the third grade with a below-grade reading level of K, which was the benchmark for the middle of second grade. Her end-of-year grade averages were as follows: A's in mathematics, science social studies, art, music, and physical education; B's in reading and writing. She was also assessed in third grade with the Partnership for Assessment of Readiness for College and Careers ("PARCC") test and received a score in the "met expectations" category, including both reading and writing. S.F.'s parents attributed S.F.'s improvement to their private tutoring at Imagine Possibility. During the summer of 2018, S.F. attended the Lab School's summer program and then resumed her private tutoring at Imagine Possibility to the end of the summer.

S.F. began fourth grade in September 2018 at the Lab School, where she was deemed to be reading at a level D, or the late kindergarten, early first grade level. Also in September 2018, the IEP team met with S.F.'s parents and Ms. Taylor to review data provided by Ms. Taylor related to S.F.'s progress using the OG method the prior year. The IEP team agreed to amend the IEP to increase S.F.'s time outside the general education setting by an hour to five hours per week of specialized instruction to ensure that she received a daily reading intervention, and the team added the proposed supplemental aides proposed by S.F.'s parents. MCPS also agreed to offer the OG intervention daily although it was not specifically included in the IEP. However, S.F.'s parents continued to feel that there was an insufficient amount of specialized instruction, and by the time the proposal was made, S.F. was doing well at the Lab School and enjoying it. Additionally, the Lab School completed an Occupational Therapy assessment of S.F.'s fine motor and handwriting skills, and the evaluator recommended Occupational Therapy services twice a week for 45 minutes per session. Based on teacher feedback, the Lab School also began providing Speech and Language services to S.F. in November 2018 for 45 minutes per week. On December 19, 2018,

the IEP team met and considered additional documentation from the Lab School but found that S.F. did not qualify for Occupational Therapy services or speech/language services.   MCPS continued to recommend Little Bennett for implementation of the IEP.

S.F.'s parents filed a due process appeal based on the MCPS proposal.  A hearing was held over the course of 10 days in January through March 2019.  The ALJ issued her decision in favor of MCPS on April 1, 2019, finding that MCPS provided a FAPE and S.F.'s parents were not entitled to reimbursement for tuition and expenses at the Lab School.  *See* ALJ Decision 100.

On July 29, 2019, Plaintiffs filed a Complaint seeking review of the decision, asserting three causes of action: (1) failure to provide a FAPE; (2) failure to provide an appropriate educational placement; and (3) due process violation by failing to conduct a fair, competent, and impartial due process hearing.  Compl., ECF No. 1. Plaintiffs request that the Court issue judgment for them and against Defendants; issue declaratory relief that Defendants violated Plaintiffs' rights under applicable law; issue injunctive relief, vacating the ALJ's decision and ordering Defendants to reimburse Plaintiffs for the costs associated with enrolling S.F. at the Lab School for the 2018-19 school year; order Defendants to place and fund S.F. at the Lab School and declare it to be her current educational placement under the IDEA; and order Defendants to pay Plaintiffs' reasonable attorneys' fees and costs, including the costs of this action.  *Id.* at 19.  The parties filed the pending cross-motions for summary judgment.  ECF Nos. 18, 22.

## STANDARD OF REVIEW

In reviewing cross-motions for summary judgment in an IDEA action, the "'reviewing court is obliged to conduct a modified *de novo* review'" of the administrative record, "'giving "due weight" to the underlying administrative proceedings.'"  *M.C. v. Starr*, No. DKC-13-3617, 2014 WL 7404576, at *6 (D. Md. Dec. 29, 2014) (quoting *M.M. ex rel. D.M. v. Sch. Dist. of Greenville*

*Cnty.*, 303 F.3d 523, 530-31 (4th Cir. 2002)) (citing *Bd. of Educ. of the Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176 (1982)). This means that when an ALJ makes findings of fact "in a regular manner and with evidentiary support," those findings "are entitled to be considered *prima facie* correct," and "the district court, if it is not going to follow them, is required to explain why it does not." *Doyle v. Arlington Cnty. Sch. Bd.*, 953 F.2d 100, 105 (4th Cir. 1991); *see N.P. v. Maxwell*, 711 F. App'x 713, 718 (4th Cir. 2017); *M.C.*, 2014 WL 7404576, at *6-7. The Court then reaches its decision based on the preponderance of the evidence. *Rowley*, 458 U.S. at 205. Yet, the Court cannot "substitute [its] own notions of sound educational policy for those of local school authorities." *M.C.*, 2014 WL 7404576, at *6-7 (quoting *M.M.*, 303 F.3d at 530-31). The burden of proof is on Plaintiffs as the party seeking relief. *See Barnett v. Fairfax Cnty. Sch. Bd.*, 927 F.2d 146, 152 (4th Cir. 1991), *cert. denied*, 502 U.S. 859 (1991).

"This standard works in tandem with the general standard of review for summary judgment, which also applies in IDEA cases . . . ." *M.C.*, 2014 WL 7404576, at *7. Thus, summary judgment is proper when the moving party demonstrates, through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . admissions, interrogatory answers, or other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), (c)(1)(A); *see Baldwin v. City of Greensboro*, 714 F.3d 828, 833 (4th Cir. 2013). If the party seeking summary judgment demonstrates that there is no evidence to support the nonmoving party's case, the burden shifts to the nonmoving party to identify evidence that shows that a genuine dispute exists as to material facts. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-87 & n.10 (1986). When considering cross-motions for summary judgment, "the court must view each motion in a light most favorable to the non-

movant." *Linzer v. Sebelius*, No. AW-07-597, 2009 WL 2778269, at *4 (D. Md. Aug. 28, 2009);

*see Mellen v. Bunting*, 327 F.3d 355, 363 (4th Cir. 2003).

## DISCUSSION

Plaintiffs make the following arguments: (1) the ALJ's decision is not entitled to deference;

the ALJ made multiple errors: not giving weight to the Reading Grant; giving complete deference

to the school system experts while giving no weight to S.F.'s parents' experts; and acting

inappropriately during the hearing process; (2) the Court should admit and consider additional

evidence; (3) MCPS denied S.F. a free appropriate public education (FAPE) by proposing that she

remain at Little Bennett for the 2018-19 school year; and (4) reimbursement for Lab School is

appropriate.  Pls.' Mot., ECF No. 18.  I shall consider each argument in turn.

## I.      Deference to the ALJ Decision

Plaintiffs cite a 2017 decision by the Ninth Circuit Court of Appeals, which explained that

"some deference" is due to ALJ decisions, "but only where they are *thorough and careful*."  Pls.'

Mot. 14 (quoting *M.C. by & through M.N. v. Antelope Valley Union High Sch. Dist.*, 858 F.3d

1189 (9th Cir. 2017) (emphasis added)). The Court added that the "extent of deference to be given"

is within the reviewing court's discretion, *id.* and an opinion is not thorough and careful if the ALJ

fails to address all issues and disregards evidence presented at the hearing, *id.* at 1195, a

circumstance that was present in that case.  As I previously noted, in the Fourth Circuit, deference

must be accorded to the ALJ's findings when they are "regularly made," and "factual findings are

only considered not 'regularly made' if they are 'reached through a process that is far from the

accepted norm of a fact-finding process.'" *S.S. v. Bd. of Educ. of Harford Cnty.*, 498 F. Supp. 3d

761, 777 (D. Md. 2020) (quoting *Cnty. Sch. Bd. of Henrico Cnty, Va. v. Z.P.*, 399 F.3d 298, 305

(4th Cir. 2005)); *see also SE.H. v. Bd. of Educ. of Anne Arundel Cnty. Pub. Sch.*, 647 F. App'x

242, 248 (4th Cir. 2016).  The "accepted norm" means that a proper hearing was conducted, the parents and school were both allowed to present evidence and make arguments, and the hearing officer's decisions were not made arbitrarily.  *Id.* (citing *J.P. ex rel. Peterson v. Cnty. Sch. Bd. of Hanover Cnty., Va.*, 516 F.3d 254, 259 (4th Cir. 2008)).  Therefore, my first step is to determine the degree of deference to which the ALJ's findings are entitled.

Plaintiffs have cited specific errors that they allege were made by the ALJ.  First, Plaintiffs assert that the ALJ erred by not giving weight to the Reading Grant.  Pls.' Mot. 34-37.  "The Reading Grant was a system-wide proposal and program MCPS obtained from the State Educational Agency to address problems in the instruction of reading to Special Education students."  *Id.* at 34 n.3.  The Reading Grant was admitted into evidence over MCPS's objection, and the ALJ found that it was "simply not relevant," giving it "no weight."  ALJ Decision 88.  The ALJ's decision to give the Reading Grant no weight was not arbitrary.  She accepted it into evidence, considered its contents, heard arguments from both sides, and determined that it provided only general information, was not specific to S.F., and supported a conclusion that MCPS was seeking to improve its strategies for IEPs.  *Id.* at 87.  The ALJ specifically stated that she gave it no weight because she was required to consider specific evidence regarding S.F. rather than general conclusions about MCPS.  *Id.* at 87-88.  I conclude that the ALJ's decision regarding the Reading Grant was regularly made.

Second, Plaintiffs assert that the ALJ erred by giving complete deference to the school system experts while giving no weight to S.F.'s parents' experts.  Pls.' Mot. 41-47.  Plaintiffs argue that although the ALJ acknowledged their experts' experience and knowledge, she dismissed their recommendations with no substantive reasons.  *Id.* 42-43.  However, the ALJ reviewed in detail each expert's documents and testimony as well as the arguments of the parties, and she explained

the reasons for her weighting.  *See, e.g.*, ALJ Decision 47-53 (Plaintiffs' testimony); 54-57 (MCPS

testimony); 57-87 (analysis).  The ALJ indicated that she found Plaintiffs' experts credible, and

she indicated that she found some expert's opinions more persuasive than others based on the

support of other evidence in the record.  Certainly, an ALJ can accept a witness as credible and

still find one party's evidence more persuasive.  *See J.P.*, 516 F.3d at 260-61.  Moreover, while

the district court must "'explain its reasons for rejecting the findings of the hearing officer,'" the

"IDEA hearing officer is not required to offer a detailed explanation of his or her credibility

assessments." *S.A.*, 898 F. Supp. 2d at 877 (quoting *Cnty. Sch. Bd. of Henrico Cnty., Va. v. Z.P.*,

399 F.3d 298, 306 (4th Cir. 2005)).  "[T]he Fourth Circuit has consistently held that an ALJ's

implicit credibility determinations are entitled to the same deference as explicit findings." *Id.*

Although I appreciate that Plaintiffs disagree with the ALJ's findings, I find that the ALJ met the

standard that she was required to meet and is entitled to deference. *J.P.*, 516 F.3d at 262.[5]

The educators' opinions, also, are entitled to deference.  *M.C.*, 2014 WL 7404576, at *11;

*S.A.*, 898 F. Supp. 2d at 874 (noting that this Court "owes generous deference to educators" when

it reviews IDEA cases).  Indeed, the school district's "notions of sound educational policy" are

entitled to considerable deference. *See M.M.*, 303 F.3d at 530-31; *Hartmann*, 118 F.3d at 999;

*M.C.*, 2014 WL 7404576, at *6-7; *S.A.*, 898 F. Supp. 2d at 874.   "[I]t is a longstanding policy in

IDEA cases to 'afford great deference to the judgment of education professionals.'" *N.P. v.

Maxwell*, 711 F. App'x 713, 717 (4th Cir. 2017) (quoting *E.L. ex rel. Lorsson v. Chapel Hill-

Carrboro Bd. of Educ.*, 773 F.3d 509, 517 (4th Cir. 2014)).

> At the same time, deference is based on the application of expertise
> and the exercise of judgment by school authorities. The Act vests
> these officials with responsibility for decisions of critical

---

[5]     I also note that the ALJ was thorough and careful in her evaluation of the testimony and
documents before her.

> importance to the life of a disabled child. The nature of the IEP process, from the initial consultation through state administrative proceedings, ensures that parents and school representatives will fully air their respective opinions on the degree of progress a child's IEP should pursue. *See* §§ 1414, 1415; [*Rowley*, 458 U.S.] at 208–209, 102 S. Ct. 3034. By the time any dispute reaches court, school authorities will have had a complete opportunity to bring their expertise and judgment to bear on areas of disagreement. A reviewing court may fairly expect those authorities to be able to offer a cogent and responsive explanation for their decisions that shows the IEP is reasonably calculated to enable the child to make progress appropriate in light of his circumstances.

*Endrew F.*, 137 S. Ct. at 1001-02.

Third, Plaintiffs complain that the ALJ acted inappropriately during the hearing process. Pls. Mot. 47-48 (asserting a violation of Rules 1.2 and 3.1 of the Maryland Office of Administrative Hearing Code of Judicial Conduct for Administrative Law Judges).  Plaintiffs provide two specific issues: (1) a tweet posted on Twitter on January 9, 2019, a week or so prior to the scheduled start of the hearing (Pls.' Mot. Ex. G, ECF No. 20-6); and (2) personal comments made by the ALJ to S.F.'s mother and to S.F.'s counsel during hearing breaks.  Pls.' Mot. 48.  Plaintiffs note that S.F.'s parents submitted a complaint to the proper authorities within the Office of Administrative Hearings ("OAH") in Maryland, who investigated and found no violations.  *Id.* n.5; OAH Letter, Ex. H, ECF No. 20-7.  Plaintiffs assert that the tweet was inappropriate because of the profane language used and because it referenced spelling not being difficult, and difficulty spelling is specifically one of S.F.'s disabilities. Pls.' Mot. 48.  The personal comments made referred to the ALJ's own son's IEP and consideration of Occupational Therapy services for him, which Plaintiffs note that the ALJ found that S.F. did not require.  *Id.*  Plaintiffs do not explain how these statements made by the ALJ evidence bias or prejudice, and as they note, they raised their issues to the appropriate authority, who found no violations. Defendants note that Plaintiffs' counsel explicitly stated to the ALJ during closing argument: "We've had some disagreements, but you've been –

14

you've been fair and you've got a good record, I think." Defs.' Resp. 39, ECF No. 22 (quoting Tr. at 2418).

Of course, ALJs are required to be impartial. *See* 34 C.F.R. § 300.508; 20 U.S.C. § 1415(f). "Administrative decisionmakers, like judicial ones, are entitled to a 'presumption of honesty and integrity.'" *Morris v. City of Danville*, 744 F.2d 1041, 1045 (4th Cir. 1984) (quoting *Withrow v. Larkin*, 421 U.S. 35, 47 (1975)). "Absent a showing of bias stemming from an 'extrajudicial source'" such as those indicated by 34 C.F.R. § 300.508(a), the presumption remains that the ALJ has acted in a fair and impartial manner. *Id.* Plaintiffs have failed to raise a serious question as to the ALJ's impartiality. With regard to the tweet, it was posted before the hearing in this case, and regardless of the propriety of the tweet, there is no connection to this case or any evidence of prejudice to Plaintiffs. Nor do the personal comments made during hearing breaks evidence a serious question of bias. Establishing a claim of bias on the part of a decisionmaker requires a much greater showing than made here. Based on the record before me, I find that Plaintiffs' claim of bias fails, and their due process right to a fair administrative hearing were not violated.

Further, overall, the ALJ held 10 days of hearings, during which both the Plaintiffs and MCPS were allowed to present witnesses and cross examine each other's witnesses. The 100-page opinion issued included 159 detailed findings of fact and included a well-reasoned discussion for her conclusions of law. My review of the administrative record reveals no irregularity in the fact-finding process. I find that the ALJ did not stray from the "accepted norm," and "by all indications resolved the factual questions in the normal way, without flipping a coin, throwing a dart, or otherwise abdicating [her] responsibility to decide the case." *J.P.*, 516 F.3d at 259. Therefore, I conclude that the ALJ's factual findings were regularly made, and I will accord the findings proper deference.

II.     **Consideration of Additional Evidence**

Even if the district court determines that an ALJ's regularly made findings of fact are entitled to deference, the district court must make "an independent decision based on its view of the preponderance of the evidence," make findings of fact, and decide "whether the state has complied with the IDEA." *Sumter Cnty. Sch. Dist. 17 v. Heffernan ex rel. TH*, 642 F.3d 478, 484 (4th Cir. 2011) (citing 20 U.S.C. § 1415(i)(2)(C)(iii)).  Plaintiffs request that I consider additional evidence pursuant to 20 U.S.C. § 1415(i)(2)(C)(ii), which states that in an action brought to appeal the results of a due process hearing, "the court . . . shall hear additional evidence at the request of a party."  Pls.' Mot. 37-41.

The Fourth Circuit has adopted the First Circuit's *Burlington* approach to the concept of "additional evidence."  *Springer v. Fairfax Cnty. Sch. Bd.*, 134 F.3d 659, 666-67 (4th Cir. 1998) (citing *Town of Burlington v. Dep't of Educ.*, 736 F.3d 773, 790 (1st Cir. 1984, *aff'd*, 471 U.S. 359 (1985)).  As such, "additional" is construed as "supplemental," which would typically exclude "testimony from all who did, or could have, testified before the administrative hearing."  *Id.*  at 667.  Such limits are necessary to protect the role of the administrative hearing as the primary forum in which to resolve disputes regarding IEPs. *Id.*  "The reasons for supplementation will vary; they might include gaps in the administrative transcript owing to mechanical failure, unavailability of a witness, an improper exclusion of evidence by the administrative agency, and evidence concerning relevant events occurring subsequent to the administrative hearing."  *Burlington*, 736 F.2d at 790.  The inevitable post-hearing evidence may be admissible but be given little or no weight by the reviewing court.  *See Schaffer v. Weast*, 554 F.3d 470, 476 (4th Cir. 2009) ("[T]his type of post-hearing evidence still risks diminishing the role of administrative proceedings under the IDEA.").  The *Schaffer* Court determined that "where an IEP is accepted, evidence of

educational progress under that IEP is useful in deciding whether the IEP was appropriate." *Id.* at 478.

Here, Plaintiffs seek consideration of the following documents, all of which post-date the hearings and the ALJ Decision: (1) Lab School End of Year Report for the 2018-19 School Year, Ex. A, ECF No. 20; (2) Lab School Road to Reading and Spelling Summer 2019 report, Ex. B, ECF No. 20-1; (3) Summer 2019 Occupational Therapy Report, Ex. C, ECF No. 20-2; (4) August 2019 Qualitative Reading Inventory (QRI) from Imagine Possibilities, Ex. D, ECF No. 20-3; (5) Formal Observation report and Comparison Summary by Lisa Taylor, Ex. E, ECF No. 20-4; and (6) Fall 2019 Reading Data, Ex. F, ECF No. 20-5.  Pls.' Mot. 39.  Plaintiffs contend that this evidence demonstrates that full-time placement at the Lab School and OG intervention were necessary to address S.F.'s reading deficits.  *Id.*   Defendants argue that this evidence of S.F.'s performance in an entirely different school year at the Lab School is not relevant to whether the prospective IEP at MCPS was appropriate. Defs.' Resp. 42-43.  I agree that there is little relevance to reviewing S.F.'s progress at the Lab School, a private school, in determining whether the MCPS offered a free appropriate public education. *See M.M. ex rel. J.M. v. Foose*, 165 F. Supp. 3d 365, 379-80 (D. Md. 2015).  However, in my discretion, I shall admit the evidence into the record, although I give it no weight for the purpose of assessing the adequacy of the proposed IEP, which assessment is based on the evidence that was before the IEP team at the time and not through the lens of hindsight. *See Endrew F.*, 137 S. Ct. at 999 (recognizing that crafting an appropriate program of education requires a prospective judgment by school officials).

## III.    Free Appropriate Public Education at MCPS

To obtain court-ordered reimbursement for S.F.'s private education at the Lab School, Plaintiffs first must demonstrate that "the public school system failed to provide a free appropriate

public education." *Carter ex rel. Carter v. Florence Cnty. Sch. Dist. Four*, 950 F.2d 156, 161 (4th Cir. 1991) (stating that, if plaintiffs establish the first element, the second element to prove is that "the private school chosen by the parents did provide an appropriate education to the child"). Plaintiffs contend that MCPS denied S.F. a FAPE by proposing that she remain at Little Bennett for the 2018-19 school year. Pls.' Mot. 15. Plaintiffs provide the following reasons for their contention: (1) the ALJ erred in finding that S.F. made meaningful progress in third grade, while ignoring the impact of the privately provided OG services, *id.* at 15-26; (2) the ALJ ignored the significant social and emotional impact on S.F. from the MCPS program and placement, particularly in the general education setting, *id.* at 26-31; and (3) the ALJ erred in finding that S.F. did not require speech/language or Occupational Therapy services, *id.* at 31-34. I shall address each of these arguments in turn.

### A.   Third Grade Progress

Plaintiffs assert that the staff at Little Bennett did not grasp the fact that S.F. is extremely disabled, citing the testimony of Dr. Henley who stated that "she is one of the more severe students that I've tested over the years." *Id.* at 16-17 (quoting Tr. 357). Ms. Taylor agreed. *Id.* at 19 (citing Tr. 670). And they assert that S.F.'s consistent regression in reading levels indicates that the strategies and interventions implemented at Little Bennett were not working. *Id.* at 17. This leads Plaintiffs to the conclusion that the moderate progress the ALJ found in the third grade was "due in large part to the parents' privately provided tutoring services." *Id.* Dr. Henley specifically recommended OG, to be delivered with structure, either in one-to-one or in a small group. *Id.* at 19 (citing Tr. 452-53). Ms. Taylor testified that OG was the only intervention that could appropriately remediate S.F.'s dyslexia and teach her how to read. *Id.* But MCPS indicated it would use EIR, the same program it had used in first grade. *Id.* Plaintiffs assert that the ALJ

ignored their testimony and S.F.'s reading regression in her finding that MCPS had been responsive to the parents' concerns and experts' recommendations. *Id.* at 20. Notably, both the parents' and MCPS's witnesses recognized the benefit of the introduction of OG, and the ALJ acknowledged the "enormous benefit" from the private tutoring sessions. *Id.* at 21. Plaintiffs conclude that without OG, S.F. would not have made the progress that the ALJ relied upon, which can only mean that MCPS denied S.F. a FAPE. *Id.*

Progress, or the lack thereof, is an important factor in determining educational benefit, but it is not the only factor, and it is not dispositive. *M.S. ex rel. Simchick v. Fairfax Cnty. Sch. Bd.*, 553 F.3d 315, 327 (4th Cir. 2009) (citing *Rowley*, 458 U.S. at 207 n. 28). "[I]n some situations, evidence of *actual progress* may be relevant to a determination of whether a challenged IEP was reasonably calculated to confer some educational benefit."[6] *Id.* A FAPE requires that an IEP be "specifically designed" to meet the child's "unique needs" so as to "enable the child to make progress." *Endrew F.*, 137 S. Ct. at 998-99. Here, the ALJ considered evidence provided by S.F.'s parents and their witnesses, as well as MCPS and its witnesses, including S.F.'s grades, informal and formal assessments, informal data from S.F.'s teachers, progress reports, and S.F.'s parents' evaluations. *See* ALJ Decision 58, 74-77. The ALJ specifically addressed Ms. Taylor's and Dr. Henley's testimony, and she specifically addressed the assertion that any progress seen in the third grade was as a result of the private tutoring with Imagine Possibility. *Id.* at 78-80. In fact, the ALJ considered it a "compelling argument," but found that it did not necessarily follow that the IEP for the fourth grade failed to provide S.F. with FAPE. *Id.* at 80. Rather, she reasoned that an IEP that is reasonably calculated to provide S.F. with educational benefit in the fourth grade must

---

[6]     I note that the Plaintiffs are citing the lack of progress made in the third grade under the 2017-18 IEP, but they are challenging the IEP proposed for the 2018-19 school year.

adequately acknowledge and address S.F.'s deficits in phonological skills, and she explained why she found that the IEP did adequately address S.F.'s phonological deficits. *Id.* Importantly, the ALJ recognized that both Dr. Henley and Ms. Taylor provided significant input to the 2018-19 IEP, and the goals and objectives for the IEP were developed with S.F.'s phonological deficits in mind. *Id.* at 81-82. Also, she found that S.F.'s progress during the third grade was not only due to the addition of OG, but also the substantial changes made in S.F.'s education program in the third grade at Little Bennett, indicating that it was the confluence of factors working together rather than just one factor that had an impact. *Id.* at 83. The ALJ also noted that it is well established, as acknowledged by S.F.'s parents, that the IEP team's failure to specify any particular reading intervention, such as OG, in the written IEP does not equate to a failure to provide FAPE. *Id.* at 74.

As discussed above, I see no reason to conclude that the ALJ ignored evidence or improperly credited the parties' witnesses. Not only do I find that the ALJ's findings were regularly made and entitled to deference, but I have also independently reviewed the record, and I find that the facts and testimony relied upon by the ALJ were supported by the documentary record and by credible witness testimony. Accordingly, I see no reason the upset the ALJ's determination that S.F.'s progress (albeit limited) in third grade was based on multiple factors and that the goals and programs outlined in the 2018-19 IEP were designed for S.F. to make progress based on a reasonable evaluation of her unique abilities and disabilities.

### B.     Social and Emotional Impact

Plaintiffs argue that the ALJ ignored the significant social and emotional struggles that S.F. endured at Little Bennett in a general education setting. Pls. Mot. 26. Plaintiffs had sought

increased specialized instruction outside of general education, and they acknowledge that the hours did increase in the IEP, but only minimally, which they deemed insufficient. *Id.*

The ALJ did not ignore S.F.'s distress, and specifically addressed the issue in the context of the 2018-19 IEP. ALJ Decision 85. The ALJ made a finding, based on testimony and other evidence in the record, that S.F. was "generally a happy, social child who liked school, but that she struggled with her emotions at times, experiencing frustration, sadness, and anxiety about being behind her classmates in reading. At times, this frustration and sadness meant the Student had negative and angry feelings about attending school. Sometimes, she was disengaged in the classroom, particularly during whole-group instruction." *Id.* at 85-86. The ALJ also found that MCPS responded to these concerns, including by adding a social-emotional goal to the IEP at S.F.'s parents and Ms. Taylor's request. *Id.* at 86 (citing MCPS Ex. 21). In particular, the IEP provided for 30 minutes of counseling a week and a "flash pass" to visit the guidance counselor as needed. *Id.* MCPS also took steps to boost S.F.'s confidence and self-esteem by assigning her a role of ambassador to new students and a buddy to a kindergartner. *Id.* (citing Tr. 1891-93).

IDEA prefers that a child be fully integrated in the regular classroom. *Endrew F.*, 137 S. Ct. at 1000. Under the IDEA, schools are to place disabled students in the least restrictive environment to achieve a FAPE, i.e., a disabled child should participate in the same activities as nondisabled children to the "maximum extent appropriate." 20 U.S.C. § 1412(a)(5)(A). Therefore, it was necessary for the IEP to balance requirements for one-on-one instruction with whole-group interaction. Indeed, the IEP team accepted S.F.'s parents' proposals for more hours, and increased pullout services from four hours to five hours per week. Further, "once a procedurally proper IEP has been formulated, a reviewing court should be reluctant indeed to second-guess the judgment

of education professionals." *Tice By and Through Tice v. Botetourt Cnty. Sch. Bd.*, 908 F.2d 1200, 1207 (4th Cir. 1990) (citing *Rowley*, 458 U.S. at 207-08).

Having independently reviewed the record, I agree with the ALJ that there is sufficient evidence that MCPS was responsive to S.F.'s struggles, and the proposed IEP did not fall short in its goal-setting and programs designed to address S.F.'s social and emotional well-being. Appropriate, the IEP also balanced the need for pull-out special education instruction with the benefits of participation in the general education environment.

### C.   Speech, Language, and Occupational Therapy Services

Finally, the Plaintiffs argue that the ALJ erred in finding that S.F. did not require speech/language or Occupational Therapy services. Pls.' Mot. 31. Specifically, Plaintiffs take issue with the ALJ finding their experts less persuasive on the basis that they had not evaluated S.F. or provided her with direct services or attended any IEP meetings. *Id.* Plaintiffs contend that S.F. required speech/language services as part of the MCPS proposal in April 2018. *Id.* at 32. At the Lab School, S.F. receives one 45-minute session per week of speech/language services, whereas the proposed IEP contained no speech/language services.

Here, the ALJ reviewed the assessment conducted at MCPS based on S.F.'s parents' request in November 2017. ALJ Decision 59 (citing MCPS Ex. 22). The speech/language pathologist that performed the assessment held impressive professional credentials, conducted a thorough review, and the ALJ gave her opinion significant weight. *Id.* at 60. Other evidence in the record supported the opinion. *Id.* The ALJ noted that the Plaintiffs' expert, a Speech-Language Pathologist and Literacy Specialist at the Lab School, was also well credentialed with many years of experience, but the ALJ found her less persuasive. *Id.* at 61, 63. The ALJ explained her reasons for finding the MCPS speech/language pathologist more persuasive, including that she had

personally evaluated S.F. *Id.* at 64.  Upon evaluating the testimony and evidence provided by both experts, the ALJ was persuaded that S.F. did not require specialized instruction or accommodations or the services of a speech/language pathologist. *Id.* Therefore, she found that MCPS's decision to not include such services in the proposed IEP was appropriate.  *Id.*

The ALJ also reviewed the request for Occupational Therapy services. *Id.* S.F. underwent a formal evaluation for Occupational Therapy services in September 2018, which resulted in the Lab School providing such services twice a week for 45 minutes each.  *Id.* at 64-66 (citing testimony and Pls.' Ex. 75).  The MCPS IEP team considered the Lab School's evaluation in November 2018 and performed their own review.  *Id.* at 66.  MCPS focused on whether S.F. was physically able to use school tools and materials to participate in class and conducted classroom evaluation and interviews with S.F.'s teachers.  *Id.* MCPS considered classroom performance and a school-based evaluation more appropriate than a strictly clinical evaluation, noting that not all low scores in clinical testing affect classroom performance. *Id.* at 67-68. S.F.'s teachers consistently reported that S.F. did not have difficulty handling classroom tools and materials, and they had not observed sensor problems or barriers to class participation.  *Id.* at 68-69.  Since the IEP is to address school-based services, the ALJ was persuaded by MCPS that S.F.'s occupational therapy needs were not as significant as described by the Lab School's clinical evaluation.  *Id.* at 70.

Based on my review of the record and testimony, I find that it supports the ALJ's finding that the IEP for the 2018-19 school year did not require the inclusion of special speech/language and Occupational Therapy services.

D.      The 2018-19 IEP

The proposed IEP was developed in a collaborative process by the IEP Team that included S.F.'s parents and their advocates, Ms. Taylor and Dr. Henley.  Although the final version did not contain all of S.F.'s parents' requests and suggestions, they were all considered by the team, and many were incorporated.  The issue before me is not whether the IEP incorporated "all services necessary to maximize [S.F.'s] potential," *Rowley*, 458 U.S. at 204, but rather, whether the IEP was "reasonably calculated to enable [S.F.] to make progress appropriate in light of [her] circumstances."  *Endrew F.*, 137 S. Ct. at 999.  "Any review of an IEP must appreciate that the question is whether the IEP is reasonable, not whether the court regards it as ideal." *Id.*  In that context, the administrative record supports the ALJ's finding that the 2018-19 IEP was reasonably calculated to provide S.F. with educational benefit tailored to her unique needs, consistent with *Rowley* and *Endrew F.*, and that MCPS and the staff at Little Bennett had the ability to implement the IEP.

A student's IEP must include, *inter alia*, "the child's present levels of academic achievement and functional performance"; "measurable annual goals, including academic and functional goals"; "the special education and related services and supplementary aids and services . . . to be provided to the child"; and "an explanation of the extent, if any, to which the child will not participate with nondisabled children in the regular class[.]" *See* §§ 1414(d)(1)(A)(i)(I), (II), (IV), (V).  As the ALJ explained in her well-reasoned decision, supported by the evidence of record, the proposed IEP identified S.F.'s present levels of performance, detailed measurable goals, special education and related services to be provided (including extended school year services and counselling services), and special education instruction as well as time in the general education environment.  Although S.F.'s parents insist that S.F. would make better progress in the

24

self-contained setting at the Lab School, the IDEA's preference is to educate children with disabilities alongside children without disabilities "to the maximum extent appropriate." 20 U.S.C. § 1412(a)(1)(5). Given this "least restrictive environment" requirement, the IEP properly addressed S.F.'s individualized learning needs in combination with her participation in the general education setting.  Thus, the IEP provides S.F. with access to a FAPE in the least restrictive environment.

While I have no doubt that S.F.'s parents prefer Lab School, or that S.F. is making good progress at the Lab School, their preference is not the standard for determining whether MCPS could provide a FAPE,[7] and S.F.'s progress at the Lab School is not evidence that she could not have made progress at Little Bennett. "Parents seeking reimbursement for a unilateral private placement must first show that the proposed placement would not have provided a FAPE, and then show that the parental placement was successfully providing a FAPE." *J.R. v. Smith*, Civ. No. DKC 16-1633, 2017 WL 3592453, at *7 (D. Md. Aug. 21, 2017).  Because I find that the proposed IEP and placement at Little Bennett provided S.F. access to a FAPE, I do not consider whether placement at the Lab School was appropriate, and Plaintiffs are not entitled to reimbursement for their expenditures on the private special education that they chose for S.F.

## CONCLUSION

In sum, Plaintiffs have not shown that "the public school system failed to provide a free appropriate public education" to S.F. for the 2018-19 school year.  *See Carter*, 950 F.3d at 161.  I find that the ALJ's decision was regularly made, amply supported by the evidence of record, and I hereby affirm her determination that S.F. had access to a free appropriate public education at

---

[7]     Neither is it about the court's preferences.  *See Rowley*, 458 U.S. at 207 ("[C]ourts must be careful to avoid imposing their view of preferable educational methods upon the States.").

MCPS.  Accordingly, the Plaintiffs' motion for summary judgment, ECF No. 18, is DENIED, and

Defendants' cross-motion for summary judgment, ECF No. 22, is GRANTED.

## ORDER

Accordingly, it is, this <u>3rd</u> day of August, 2022, hereby ORDERED that

1.   Plaintiffs' Motion for Summary Judgment, ECF No. 18, IS DENIED;

2.   Defendants' Cross-Motion for Summary Judgment, ECF No. 22, IS GRANTED; and

3.   The Clerk IS DIRECTED to CLOSE THIS CASE.


_____/S/_____
Paul W. Grimm
United States District Judge